BROWN, Adm'r, Office of Price Administration, v. CONNER.

Civil Action No. 868.

District Court, S. D. Texas, Houston Division.

May 7, 1943.

David Ginsburg, of Washington, D. C., Brunson MacChesney, of Chicago, Ill., Vernon Munroe, Jr., of New York City, Talbot Smith, of Ann Arbor, Mich., W. B. Harrell, Amos J. Coffman, and Norman R. Crozier, Jr., all of Dallas, Tex., and K. C. Barkley and Douglas W. McGregor, U. S. Atty., both of Houston, Tex., for plaintiff.

Vinson, Elkins, Weems & Francis (by Frank G. Dyer), of Houston, Tex., for defendant.

KEMMERLY, District Judge.

This is a suit under the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix § 901 et seq., by the Price Administrator (for brevity called Plaintiff), against G. G. Conner, trading as the Houston Hide Company and the Houston Hide & Fur Company (for brevity called Defendant), a dealer in hides, seeking to enjoin him from violating such Act and Price Schedule 9, etc. promulgated under such Act.

In the original complaint, filed September 29, 1942, Plaintiff, as a basis for injunction against Defendant, says:

"Since February 21, 1942, defendant has bought and sold, received and delivered, hides, kips and calfskins at prices in excess of the maximum prices set forth in said Price Schedule No. 9.

"Under invoice dated April 3, 1942, defendant sold and delivered to Beggs & Cobb, Inc., Boston, Massachusetts and Winchester, Massachusetts, a carload of hides, kips, and calfskins, which carload of hides, kips, and calfskins was delivered on or about April 15, 1942, for a total sum of $12,242.15. That such price was in excess of the maximum price set forth in said Schedule No. 9."

In passing on Plaintiff's application for preliminary injunction, I said with respect to Defendant's activities:

"Since the effective date of such Act, he has, according to the evidence, shipped under such Act from Houston, Texas, to such Eastern markets car loads of hides on these dates:-

"(a) One car load on April 3, 1942.

"(b) Two car loads on August 9, 1942.

"(c) One car load or perhaps two car loads on September 29, 1942.

"Differences arose between Defendant and the Administrator with respect to the car shipped April 3, 1942, and while the grading and classification of hides is largely a matter of opinion, the weight of the evidence indicates that Defendant was at fault (but not willfully so) in his grading and classification of the hides in that car. There has been no complaint, however, with respect to the two cars shipped August 9, 1942, and up to the time of hearing, no complaint as to the car or cars shipped about September 29, 1942.

"In shipping the cars on and since August 9, 1942, a different method of grading and classification was used by Defendant, which appears satisfactory to Plaintiff. Defendant indicates in his Answer and Affidavits that he expects to continue doing business as he has been doing since August 9, 1942.

"There is no dependable evidence of any violation of the Act by Defendant other than the above shipment of April 3, 1942."

On February 6, 1943, Plaintiff filed amended complaint, and as the basis for injunction against Defendant sets forth that

Defendant has since February 21, 1942, violated the Emergency Price Control Act of 1942 and Price Schedule No. 9 issued thereunder, and specifically alleges that Defendant has shipped to the Eastern Markets and sold carloads of hides, the prices of which violated such Act and such Schedule, on the following dates:

February 27, 1942.
March 6, 1942.
March 17, 1942.
April 3, 1942.
April 24, 1942.
October 28, 1942.

Plaintiff also complains of Defendant's bookkeeping methods, and asks that he be enjoined, etc.

While at the trial only three witnesses testified, there were by Stipulation numerous and voluminous affidavits or copies of affidavits offered. Also numerous Exhibits. From the testimony of the witnesses, the affidavits, and the exhibits, I find the following facts:

(a) Apparently for some months after the date of the approval of the Emergency Price Control Act and the promulgation of Schedules thereunder, there was much confusion among hide men and shippers of hides as to the proper classification, price, etc., of hides, and I am unable to find in this record any evidence of a willful violation by Defendant of the Act or the Price Schedules. Defendant made some errors of judgment, but probably any man with Defendant's background and training would have made them.

Defendant has made, since the effective date of the Act, perhaps 12 or 15 carload shipments and sales of hides. As hereinbefore stated, Plaintiff complains here of six shipments. The first shipment complained of was made February 27, 1942, and the last one complained of was made October 28, 1942. The Regional Hide Price Specialist for the Office of Price Administration (Braum) testifies as follows as to the shipment of February 27, 1942:

"A. That is February 27. The tannery report indicates that 1,141 kips invoiced as packers were countries, according to 1,-314.12, Paragraph D, Revised Price Schedule No. 9, making a difference on that car on the kip alone of $1,149.68. That was on the kips.

"Q. Yes, sir. A. On the hides, the tannery report indicates that there were 70 per cent No. 2's and 3's in with No. 1's and No. 2's, native packer hides. The invoice shows that, of the total of the hides shipped, nearly 26½ per cent billed were No. 2's. If we figure that on the basis of Section 1,314.12, Paragraph D of Revised Price Schedule No. 9, we have a difference there of $36.50.

"The Court: A difference which way? A. That the shipper received over and above the ceiling.

"Mr. Dyer: How much did that whole car cost? A. I haven't got the total amount.

"Mr. Dyer: Several thousand dollars, wasn't it? A. Oh, yes, I imagine the amount usually ran eight, nine, ten thousand dollars.

"Now on the No. 1 packer hides, the tannery reports that they should have all been sold as No. 2 hides, making a total over and above the price ceiling of $1,389.18. A claim was made by the tanner on this shipment of $600.00.

"Mr. Dyer: That was paid, wasn't it? A. I am not sure."

The same witness testifies as to the shipment of October 28, 1942, as follows:

"Q. Now on the shipment of October 28, 1942, car N.Y.C., No. 52568. A. I don't think I have my affidavit on that.

"Q. Get your affidavit on that. Did you in connection with your official duties make an inspection of that car? A. Yes, sir.

"Q. Tell us what you found as a result of your inspection, Mr. Braum.

"Mr. Dyer: Let me ask him this, in order to get this before the Court: This is the only car that you are claiming a violation on that you didn't claim before this temporary injunction matter was passed on, isn't that correct, Mr. Braum? A. I think so.

"Mr. Odem: That is right. Mr. Dyer. The record will so reflect that.

"Mr. Dyer: I just wanted the Court to understand that. A. I examined 71 hides which were sold on a flat basis. I will explain that. It means that the No. 1's and No. 2's were not separated and sold separately but were sold on a basis allowed by the schedule for selling them just as hides, without determining how many No. 2's are contained in the load with the No. 1's.

"Q. How are the others sold? A. On the selected basis, where the No. 1's and No. 2's are bundled separately and sold separately.

"Q. That is what these others were, on the selected basis? A. Yes.

"Q. All right. A. I found in there 9 branded hides.

"Q. You made the usual—A. The same sort of examination. Yes, the same sort as I had done in the previous examination.

"I found 9 which had brands. I found 4, one of which contained a brand, there were No. 3 hides for slips.

"Q. Explain what you mean by the term 'slip.' A. A slippy condition results in hides from any number of factors, like excess heat and age, and to explain what slippy means, the hair comes loose from the hide as a result of spoilage and the grain of the hide is damaged, which is the outside and the show side of leather. In other words, when the hide is tanned into leather, you will not have the smooth grain which results from a good hide.

"One of these hides was a bull hide which weighed 64 pounds.

"Q. Now they were sold on a selected basis? A. No, they were sold on a flat basis.

"Q. Well now what would be the results of your findings on that kind of sale, Mr. Braum? A. What would be the results?

"Q. Yes, sir. A. Well, I felt it was a big improvement over the other shipment I inspected.

"Q. Well, I mean as far as dollars and cents are concerned. Did you make a calculation? A. Yes, I did. It amounted to approximately $7.48 over and above what it should have been invoiced at.

"The Court: On the whole car? A. No, on this one particular lot that I looked at.

"Q. (by Mr. Odem) All right. Go on with the next one. A. I then looked at 30 pieces listed and described as No. 1 native packer kips and found that out of these 30 pieces one weighed 31 pounds. That was the only overweight contained in this lot. These were also sold flat.

"Mr. Dyer: Did you allow the pound there that you said you had been allowing? A. Yes. There was only one that weighed 31 pounds or more and that one weighed 31 pounds.

"Q. (by Mr. Odem) That is, after allowing the pound that you spoke of allowing before? A. Well, yes. I mean it weighed 31 pounds.

"Q. All right. A. I then examined 62 pieces listed and described as country kips, out of which I found that three, one of which weighed 32½ pounds, had brands and one was a No. 3 kip. In addition I found 7 pieces which weighed 31 pounds or more. I estimated the amount which this would be over the ceiling prices, and this one lot would be about $26.27.

"Q. Your next lot? A. I then examined 28 pieces listed and described as city kips. They were also sold flat. In the 28 pieces I found that four of them weighed 31 pounds or more. That is all.

"Q. Did you make an estimate of that? A. Oh, yes. I made an estimate on the amount at which the city kip had been invoiced over and above the ceiling, and it was $24.44.

"The Court: What was the total over and above, if any, on the October 28 car? A. For the whole car, $58.19 approximately. That is taking the liberal viewpoint on figuring it.

"Mr. Dyer: What is the total invoice price for the car? A. I haven't the invoice here myself. Just a moment. I have it here in my file.

"Mr. Dyer: Isn't it attached to your affidavit? A. $9,780.00.

"I want to state, your Honor, that in figuring up my estimate of what they were sold for over and above the ceiling, I didn't figure them according to the extreme view allowed by Schedule No. 9 in 1314, Paragraph B. Can I read that paragraph?

"Q. (by Mr. Odem) What does it have to do with it? A. With reference to hides or skins sold in mixed lots, where lower grades are contained in with hides at a specified price.

"Q. That is in Schedule 9? A. Yes.

"Mr. Dyer: That is the law, isn't it?

"Mr. Odem: Sure. A. Well, I didn't figure my estimates according to the schedule. I figured them on just exactly what I found wrong and the amount that I figured was wrong that was contained in that lot.

"Q. Of course, as I asked you before, you were detailed to make these inspections? A. I beg your pardon?

"Q. You were detailed and told to go make these inspections by your superior? A. Yes, I was directed to make these inspections.

"The Court: The extent to which you found the October 28 car wrong was $58.19? Is that what you are telling me? A. According to my figures, yes sir."

It will be observed that the excess price in the February 27, 1942, shipment made soon after the effective date of the Act was between ten and fifteen per cent, while the excess price of the shipment of October 28, 1942, is only a little in excess of one half of one per cent. The figures on the other shipments complained of by Plaintiff run approximately in between the figures on these two cars, and, as stated, there were a number of cars about which there is no complaint. Any excess could easily have occurred, and I find did occur, by reason of differences in judgment of the persons making the classification. This includes the excess on the shipment of April 3, 1942, mentioned in findings and conclusions filed on motion for preliminary injunction.

(b) I find no objections of consequence to the manner in which Defendant has kept his books.

1. I conclude that Plaintiff's demand for injunction contained in the prayer in his amended complaint is not supported by the evidence.

Judgment for Defendant.