**BOWLES, Adm'r, Office of Price Administration, v. CARNEGIE-ILLINOIS STEEL CORPORATION.**

**No. 8709.**

Circuit Court of Appeals, Seventh Circuit.

May 11, 1945.

Rehearing Denied June 12, 1945.

John H. Hershberger, Harlan L. Hackbert, Elbert A. Wagner, Jr., and Knapp, Cushing, Hershberger & Stevenson, all of Chicago, Ill., for Carnegie-Illinois Steel Corporation, defendant-appellant.

Fleming James, Jr., of Washington, D. C., Alex Elson, Harry E. Witherell, and Abraham H. Maller, all of Chicago, Ill., and Thomas I. Emerson, Deputy Administrator for Enforcement and Nathan Siegel, Atty., Office of Price Administration, both of Washington, D. C., for appellee.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

EVANS, Circuit Judge.

Defendant appeals from a permanent injunction enjoining it from violating Section 4 of the Emergency Price Control Act of 1942.[1] It is charged with purchasing iron and steel scrap at prices in excess of the maximum prices prescribed by the Price Schedule. Defendant denies the charge and also the propriety of the injunction.

During the period in question,[2] defendant, one of the largest producers of steel in the United States, purchased a total of 2,585 carloads of steel scrap. It operated both electric furnaces and open furnaces to process steel from scrap. Of this scrap the court found that it purchased 214 cars of iron and steel scrap of the grades designated in the Price Schedule as "Electric Furnace" scrap at the maximum price provided therefor in the Schedule, but *used* all of it in its open hearth furnaces. Ordinarily, scrap used in the electric furnaces is a purer, cleaner type (and usually of a particular sized bundle) because an electric is a closed furnace in which the impurities can not be so completely oxidized. Scrap from metal,

---

[1] 50 U.S.C.A.Appendix § 904.

"(a) It shall be unlawful, regardless of any contract, agreement, * * * or other obligation heretofore or hereafter entered into, for any person to sell or deliver any commodity, or in the course of trade or business to buy or receive any commodity, * * * or otherwise to do or omit to do any act, in violation of any regulation or order under section 2, or of any price schedule effective in accordance with the provisions of section 206, or of any regulation, order, or requirement under section 202(b) or section 205(f) * * *."

[2] February 21, 1942 to at least June 17, 1942.

a product processed in the open hearth furnace, may be pure enough to permit its use in the electric furnaces, the objectionable impurities having been eliminated. In processing its steel, defendant uses both the basic, open hearth furnaces and the electric furnaces. It has about four times as many open hearths as electrics. The O. P. A. fixed a higher ceiling price for scrap usable in electric furnaces than for scrap processed in the open hearth furnaces.

Defendant purchased this "electric furnace" scrap paying the higher price therefor, and used it in its open hearth furnaces. Controversy is over defendant's proffered explanation that after scrap was delivered, defendant found it to be of inferior quality, not usable in its electric furnaces. Also seriously present is the action of defendant in stopping completely its practice when notified that it violated the orders and regulations of the Price Control Board. Its discontinuance was complete until plaintiff told defendant to again proceed with this practice.

For its discontinued practice, it is charged with conduct which occasioned this suit and the grant of this injunction.

The proceeding was begun by the Price Administrator's filing a complaint, and a motion for preliminary injunction, supported by three affidavits. Defendant countered with affidavits filed in opposition. It also filed an answer and a statement of the circumstances under which the scrap was used in the open furnaces. The court then heard argument. No oral testimony was adduced. Detailed findings of fact and conclusions of law were filed and a temporary injunction issued. Neither the findings, conclusions, nor order on the temporary injunction found that Carnegie's action was an intentional violation of the maximum price order.

A stipulation was signed by which the affidavits theretofore filed be considered on the final hearing of the cause. No further evidence was offered.

The court's findings state:

1) Carnegie purchased 14 cars of scrap @ $19.75, which was the maximum price for "electric furnace bundles," whereas the bundles, being in excess of 14 x 14 x 20 inches (the size of ordinary electric furnace doors) were classifiable under the Schedule as No. 1 bundles for which the maximum price was $18.75.

2) Carnegie purchased 3 cars of scrap @ $19.75 a ton (electric furnace scrap maximum) but the scrap "was of a quality and character not proper to be classified as electric furnace bundles * * * and the dimensions * * * exceeded * * * 14 x 14 x 20 * * *. All of the said scrap was in fact used * * * in its electric furnaces * * * Bundles of steel scrap of the character * * * in these three cars are classified * * * as No. 2 bundles, for which the maximum price * * * was * * * $18.75 * * *."

3) Carnegie purchased 8 cars of scrap on a form of order then used by the defendant called a "blanket order" calling for "melting steel scrap for electric furnace use."

The scrap in these cars was invoiced the defendant for a higher grade of electric furnace steel scrap than was actually contained in said cars. *"The defendant paid the sellers of said steel scrap, through error and inadvertence for a higher grade of electric furnace scrap than had been actually received in accordance with the invoices submitted by the sellers of said steel scrap. The defendant discontinued the use of such blanket orders* about June 1, 1942, and has not used such blanket orders since that time."

4) Carnegie purchased 3 cars of steel scrap invoiced as a grade and at a price in excess of the actual grade of steel scrap shipped in each of the cars.

5) Carnegie "purchased 3 cars of steel scrap and *through inadvertence and error,* paid the seller of said scrap a higher price than authorized by the price schedule."

The court also found that Carnegie purchased 2,585 cars of steel scrap, of which the 214 cars of scrap here involved were designated and paid for as electric furnace scrap. It used all of said 214 car loads in its open hearth furnaces.

As a conclusion of law, the trial court found the violations of the Price Schedule were *"deliberate."*

■ In the absence of oral evidence, we are in the same position as the trial court to reach conclusions as to defendant's action, its motives, and intentions.

The unusual war time conditions made the situation critical. Ordinarily it made no difference to anyone whether defendant treated its scrap in an open or in an electric furnace. It was a matter of costs, quality of steel, and success of the different processes. However, the country was at war. The

demand for steel boomed. Regulation was necessary. Regulation of prices and of supplies was inevitable. To fix prices of steel, it was believed necessary to fix prices of scrap. This was done. Such prices distinguished between kinds of scrap. This was known to defendant who bought the scrap at the electric furnace maximum price and used it in the open hearth furnace.

Light has been supplied to guide us in such cases by the recent decision of the Court in Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 592, 88 L.Ed. 754. It said:

"The historic injunctive process was designed to deter, not to punish. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The *qualities of mercy* and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. We do not believe that such a major departure from that long tradition as is here proposed should be lightly implied.

\* \* \* \* \* \*

"The Administrator does not carry the sole burden of the war against inflation. The courts also have been entrusted with a share of that responsibility. And their discretion \* \* \* must be exercised in light of the large objectives of the Act. For the standards of the public interest not the requirements of private litigation, measure the propriety and need for injunctive relief in these cases. That discretion should reflect an acute awareness of the Congressional admonition that 'of all the consequences of war, except human slaughter, inflation is the most destructive' \* \* \*."

The crux of Carnegie's defense is stated by it, thus:

" \* \* \* defendant used said electric furnace \* \* \* scrap referred to in \* \* \* the Court's Finding \* \* \* in its \* \* \* open hearth furnaces *because said* \* \* \* *scrap was not of a proper chemical fitness* for use in its electric furnaces for the production of airplane steel \* \* \* and, upon the use of its said scrap in its open hearth furnaces, \* \* \* (it)

substituted and exchanged therefor an equivalent tonnage of scrap \* \* \* which had been produced \* \* \* as a by-product \* \* \* of its open hearth furnaces and \* \* \* fit for use in its electric furnaces.

" \* \* \* *in May 1942,* (it) *advised the Office of Price Administration in Washington,* \* \* \* of its action in using steel scrap purchased as electric furnace scrap in its open hearth furnaces as above stated.

"That *the Office of Price Administration* \* \* \* *on June 25, 1942,* in writing advised \* \* \* (it) that its practice of using such scrap in its open hearth furnaces was in violation of the Price Schedule, whereupon *the defendant ceased the use of such scrap* in its open hearth furnaces.

"Thereafter, large quantities (24,000 tons) of electric furnace steel scrap purchased by defendant, but which was not in fact satisfactory for the desired purpose, accumulated on \* \* \* (its) property \* \* \*. \* \* \* the War Production Board, in writing, \* \* \* directed \* \* \* (it) to use said electric furnace scrap in defendant's open hearth furnaces upon replacing for use by the electric furnaces an equivalent tonnage of high-grade scrap produced \* \* \* as a by-product \* \* \* (in) its open hearth furnaces."

We need not pass on one of the questions presented by the appellant, namely,—Did defendant violate the Price Administration Regulation when it purchased scrap for processing in its electric furnaces, paying the ceiling price therefor, and, finding some of it to be inferior in quality and not usable in the electric or closed furnaces, placed said scrap in its open furnaces and processed steel therefrom, in the absence of evidence and a finding thereon that the purchase of the electric scrap was made knowing that it would not be processed in the electric furnace?

We do not reach the question because it is clear that the facts do not make out a case which authorized the issuance of an injunction.

■ An injunction is a relief granted to prevent future misconduct. It does not issue to prevent a practice which has been definitely and permanently discontinued.[3]

[3] Industrial Association v. United States, 268 U.S. 64, 45 S.Ct. 403, 69 L.Ed. 849; Walling v. T. Buettner & Co., 7 Cir., 133 F.2d 306; Shore v. United States, 7 Cir., 282 F. 857; Journal of Commerce Pub. Co. v. Tribune Co., 7 Cir., 286 F. 111; 28 Am.Juris. p. 201.

The record here shows that defendant informed plaintiff of what it was doing. The primary interest of both was, of course, to produce steel for war products. Plaintiff informed defendant that it would be, in its opinion, a violation of the ceiling price ruling for defendant to use the scrap purchased at electric furnace prices, in its open hearth furnaces.

Defendant immediately acquiesced. It discontinued the practice completely. The court found that after June 25th it used none of the electric furnace scrap in the open hearth furnaces. This suit was begun in December. In fact the evidence showed defendant was painstakingly careful not to use the electric furnace scrap in the open hearth furnace. No evidence is presented which evidenced any intention or threat on defendant's part to renew the practice. It is true, plaintiff *later* directed defendant to engage in such a practice, in order to increase the output of steel for war purposes. At the same time, it directed that a like amount of metal from the open hearth furnaces be used in the electric furnaces. This, however, had nothing to do with the action which plaintiff sought to enjoin.

The decree is reversed with directions to dismiss the suit.