**BOWLES, Price Administrator, v. SAUER.**

**SAME v. COLLINS et al.**

**Civil Actions Nos. 4838, 4821.**

District Court, W. D. Pennsylvania.

Feb. 20, 1947.

A. Morris Ginsburg, Enforcement Atty., Office of Price Administration, of Pittsburgh, Pa., for plaintiff.

Joseph R. Doherty (of McCloskey, Best & Leslie), of Pittsburgh, Pa., for defendant Sterling Fuel Co.

James A. Wright, of Pittsburgh, Pa., for defendant Collins & Schweinberg & Co.

WALLACE S. GOURLEY, District Judge.

These cases are considered together and decided in one opinion due to the similarity of the facts and questions of law involved.

On August 24, 1945, a complaint for injunctive relief and treble damages of not less than $33,000 was filed against Benedict J. Sauer, trading as Sterling Fuel Company. The defendant filed a motion to dismiss.

On August 23, 1945, a complaint for injunctive relief and treble damages of not less than $3,000 was filed against Edgar Q. Collins, Ray Schweinberg and John M. Wray, individually and as partners trading as Collins & Schweinberg & Company. The defendants filed a motion to dismiss.

In each case it was alleged that the defendant made overceiling sales and otherwise violated the provisions of MPR 120.

Arguments of counsel were presented to the Court orally on said motions, and briefs have been filed by each party litigant in support of their respective positions.

The facts involved in each of the cases at bar are as follows:

On or about March 11, 1944, Collins & Schweinberg & Company planned to open a strip mine known as the Sal-Ray No. 4 Mine in the vicinity of Large, Pennsylvania, and in connection therewith planned to process the mined coal through a preparation plant or tipple, which was located on the grounds of the mine property. On March 11, 1944, Collins & Schweinberg & Company wrote to the Office of Price Administration in Washington stating as follows:

"We apply for maximum prices and price classifications and to be assigned a Mine Index Number for Sal-Ray #4, a strip mine which we are opening near Penna. Route #51, near Large, Pa., in Jefferson Township, Allegheny County, Pa. This mine should be classified and priced for both truck and rail shipments."

On March 19, 1944, Collins & Schweinberg & Company, as lessors, executed a written lease with John P. Murphy, as lessee, by the terms of which Collins & Schweinberg & Company leased to Murphy their coal tipple, bins, and other equipment necessary for processing the coal, commencing April 1, 1944. Murphy agreed to pay Collins & Schweinberg & Company rental in the amount of six cents per net ton of coal which passed through the tipple, and Murphy agreed to buy from Collins & Schweinberg & Company at least 100 tons average per day of the coal produced by Collins & Schweinberg & Company in its mine and deposited by Collins & Schweinberg & Company at the tipple; the lease gave Collins & Schweinberg & Company the right (after the needs of Murphy and of Terminal Coal & Coke Company had first been satisfied) to purchase the coal from Murphy after Murphy had processed it, at a price to be determined by adding the following items: The cost of the coal at the tipple before processing, the cost of processing the same, plus 5% on both items for profit; the lease gave Murphy the right to renew it, and the right to delegate the operation of the tipple to an agent or other person for him.

On April 17, 1944, Murphy executed a written agreement with the Sterling Fuel Company, by the terms whereof Murphy assigned said lease to said defendant, who agreed to operate the tipple at its own cost and to pay to Murphy rental of $75 per month plus such an additional sum monthly as would fairly compensate Murphy for assisting the defendant in operating said business; and Murphy was given control of the receipts to insure the proper application thereof.

Pursuant to the lease from Collins & Schweinberg & Company to Murphy, and the agreement between Murphy and the defendant, Sterling Fuel Company, said defendant thereafter bought coal which Collins & Schweinberg & Company produced at its mine and delivered to the preparation plant, and the Sterling Fuel Company used that coal in operating the preparation plant; the Sterling Fuel Company, after processing this coal, sold it to Collins & Schweinberg & Company, Terminal Coal & Coke Company and to others at the tipple.

On May 18, 1944, the Office of Price Administration in Washington handed down Order No. 763 under Maximum Price Regulation 120, which stated:

"For the reasons set forth in an accompanying opinion, and in accordance with Section 1340.210(a) (6) of Maximum Price Regulation No. 120, it is ordered:

"Producers identified herein operate named mines assigned the mine index numbers, the price classifications and the maximum prices, for the indicated uses and shipments as set forth herein. All are in District No. 2. The location of each mine is given by County and State. Each producer is subject to all provisions of Maximum Price Regulation No. 120."

The Order proceeded to establish dollars and cents prices for "rail shipment," "R.R. fuel" and for "truck shipment," for the Sal-Ray No. 4 mine for all eleven size groups (including mine run, which is size group 8 as defined in Section 1340.213(b) (6) of Maximum Price Regulation No. 120).

The complaint filed by the Administrator in the case against the Sterling Fuel Company alleged in Paragraph 4 that the defendant was a producer as defined by Section 1340.208(a) (2) of Maximum Price Regulation 120, and averred in Paragraph 9 thereof the following violations:

"(a) That the defendant bought the coal from Collins & Schweinberg & Company who had failed to file with the Office of Price Administration an application for ceiling prices for the sales from Collins & Schweinberg & Company to the defendant, for the reason that these sales were not sales such as were contemplated when Order No. 763 was established by the Office of

Price Administration for rail and truck shipment, and therefore, that a special application for pricing the coal which Collins & Schweinberg & Company was mining and selling to the defendant at the tipple must be made by Collins & Schweinberg & Company under Section 1340.210(a) (6) of Maximum Price Regulation 120.

"(b) The defendant may have overpaid Collins & Schweinberg & Company in buying said coal from Collins & Schweinberg & Company, although this fact cannot be determined until Collins & Schweinberg & Company applies for and receives maximum prices under Section 1340.210(a) (6) of Maximum Price Regulation 120 for the sale of its coal to the defendant.

"(c) The defendant sold and disposed, and is selling and disposing of, said bituminous coal for delivery from said preparation plant (also referred to herein as the "tipple") operated as an adjunct of said mine, to Collins, to Terminal Coal & Coke Company, and to others, at prices higher than the maximum prices set forth in Order No. 763 under Maximum Price Regulation 120, in violation of Section 1340.201 thereof.

"(d) The lease between Collins & Schweinberg & Company and Murphy, and the agreement between Murphy and the defendant in effect constituted the defendant as the agent of Collins & Schweinberg & Company to operate the preparation plant on a cost-plus basis, with the result that it constituted a device to evade the price limitations of Maximum Price Regulation 120.

"(e) The defendant violated the recordkeeping provisions of Section 1340.205(a) (3) of Maximum Price Regulation 120."

The complaint filed by the Administrator in the case against Collins & Schweinberg & Company alleged in Paragraph 4 that the defendants were a "producer" as defined by Section 1340.208(a) (2) of MPR 120, and averred in Paragraph 9 thereof the following violations by the defendants:

"(a) That the defendants failed to file with the OPA an application for specific maximum prices for their sales of coal to Sterling Fuel Company as required by Section 1340.210(a) (6) of MPR 120, inasmuch as said sales were made by delivery other than by rail and truck shipment within the

meaning and intent of MPR 120, and inasmuch as Order No. 763 under MPR 120 applied only to sales by such rail and truck shipments.

"(b) That the defendants sold its mined coal to Sterling Fuel Company at prices which may be in excess of the prices which may be established under Section 1340.210 (a) (6) of MPR 120.

"(c) That the defendants bought back their coal from Sterling Fuel Company who delivered it to them at the tipple, operated as an adjunct of the Sal-Ray #4 mine, at prices higher than the maximum prices established therefor by Order No. 763.

"(d) That the defendants, after repurchasing said coal from Sterling Fuel Company, resold the coal by direct delivery truck shipment, at prices higher than those established by Order No. 763.

"(e) That the defendants by their lease to Murphy and by his agreement with Sterling Fuel Company, in effect constituted Sterling Fuel Company their agent to operate the preparation plant on a cost-plus basis, as a result of which the price limitations of MPR 120 were evaded; and

"(f) That the defendants violated the record-keeping provisions of Section 1340.205(a) (3) of MPR 120."

The defendants contend that their operations are controlled by Revised Maximum Price Regulation 122 which applies to solid fuels sold and delivered by dealers, and that they did not violate MPR 120 which applies to bituminous coal delivered from a mine or preparation plant operated as an adjunct of a mine.

The questions before the Court in each of the cases are as follows:

1. Did Order No. 763 establish the prices for the sale by Collins & Schweinberg & Company to Sterling Fuel Company of the run-of-mine coal mined by said defendants at the Sal-Ray No. 4 Mine and delivered by them to Sterling Fuel Company at the preparation plant which they had leased to Sterling Fuel Company?

2. Were Collins & Schweinberg & Company, in repurchasing at the preparation plant some of their coal from Sterling Fuel Company after Sterling Fuel Company had processed the coal, violating Order No. 763 under MPR 120 in paying Sterling Fuel Company prices higher than those established by that Order?

3. Were the defendants, Collins & Schweinberg & Company, in reselling, by direct delivery truck shipment, the coal which they had repurchased from Sterling Fuel Company, in violation of Order No. 763 by charging their customers prices higher than those established by that Order under MPR 120?

4. Was the defendant, Sterling Fuel Company, engaged in the business of preparing bituminous coal at a preparation plant which was an adjunct of the mine operated by the defendant, Collins & Schweinberg & Company?

The questions involved in each of these cases can be reduced to the simple inquiry as to whether or not the preparation plant involved in this case is one which is an adjunct of the Sal-Ray No. 4 Mine of Collins & Schweinberg & Company.

Nowhere in MPR 120 is the word "adjunct" defined. It, therefore, becomes necessary to determine what is meant by the word "adjunct" as a noun. The following definitions are given for the noun "adjunct":

Webster's New International Dictionary (1934) : "Something joined or added to another thing, but not essentially a part of it." Synonyms are given as follows: "Addition, accessory."

Oxford English Dictionary (1933) : "Something joined to or connected with another, and subordinate to it in position, function, character, or essence; either as auxiliary to it, or essentially depending upon it." The following illustrations of the meaning of the word is given by quoting Grote's use of the word: "Each with its cluster of dependent towns as adjuncts."

For one business to be an "adjunct" of another, there must be predominant control and inter-firm relations to the extent that one firm is a mere instrumentality of the other, or it must be shown that one company was a dummy, buffer or tool, created to relieve the other company from legal obligations. Majestic Co. v. Orpheum, 8 Cir., 21 F.2d 720; New York Trust Co. v. Carpenter, 6 Cir., 250 F. 668; Industrial Re-

search Corp. v. General Motors Corp., et al., D.C., 29 F.2d 623.

In this proceeding the defendants each contend that the facts alleged indicate a bona fide business transaction or relationship between the two defendants who are dealing with each other at arm's length. The plaintiff contends in each instance that the relationship between the defendants was a subterfuge or a means used in an effort to circumvent and/or be relieved from complying with the provisions of MPR 120 as it pertains to the production and sale of bituminous coal.

To apply the definitions and uses of the word "adjunct" to the facts in the case at bar, and to the use of the word in MPR 120, it is necessary to examine the operations of the Sal-Ray No. 4 Mine. Collins & Schweinberg & Company had applied for prices for the eleven size groups of coal referred to in MPR 120, produced at this mine. Of these eleven size groups, only one—size group 8—is run-of-mine, so that all of the other ten sizes would and could be created only by having run-of-mine coal processed through the preparation plant, which was located on the mine property and which was in existence at the time that Collins & Schweinberg & Company filed its application with the OPA for the establishment of its mine index number, maximum prices and price classifications.

The ordinary processes of the coal mining industry involve the following steps in order: (1) Mining the coal—whether underground or strip; (2) hauling the coal to a preparation plant adjacent to the mine; (3) cleaning and screening the coal in the preparation plant (this operation does not apply to run-of-mine coal); (4) temporary storage in the tipple or on a stockpile (if the coal is not shipped out as soon as it comes out of the preparation processes); and (5) shipment either by rail or by truck to its first destination away from the mine premises. That destination may be the home of the consumer, or a factory, or it may be a retail coal dealer's yard located miles away from the mine. The retail coal dealer in such a case functions much like the retail grocer functions—he has brought the product from the producing area to the marketing area, for resale.

The Court is appreciative that in rare instances the retail coal dealer may buy run-of-mine coal, and after having it brought to his retail coal yard, puts it through his own preparation plant in order to prepare his own sizes of coal for marketing. Such a preparation plant would not, of course, be an "adjunct" of the mine from which the coal had been extracted, and would not be covered by MPR 120. However, the operation of preparation plants away from the mining property is not an efficient or customary operation. On the other hand, the operation of the preparation plant at or adjacent to the mine is the most efficient way of preparing the coal (except, of course, for run-of-mine coal) for marketing. The operation of the preparation plant is a necessary operation in the preparation of coal for the market, because the greatest percentage of coal that is marketed is coal that has been cleaned and screened into specified sizes in order to satisfy the various needs of coal users. Only a very small part of the coal that is mined is sold in the run-of-mine state.

Because of these economic facts which make the operation of a preparation plant at or adjacent to the mine, an integral part of the efficient operation of a mining venture, the preparation plant necessarily is an "adjunct" of the mine.

In determining whether a preparation plant is an "adjunct" of a mine, it does not make any difference whether the preparation plant is located at the mouth of the mine (if it is an underground mine) or whether it is located at or near the spot of the mining operations (if it is a strip-mine), or whether it is located several miles away from the locale of the mining operations, so long as the normal flow of the operations of the mining, cleaning and screening of the coal at the "producer" level is maintained. It is necessary, in the operation of most mining developments, to transport coal for various distances (which may be as little as 500 feet to as much as 5 miles or more), in railroad cars or in trucks, from the mine to the preparation plant, because of the vastness of the areas under which or on top of which the mining operations are conducted. The important test is whether the preparation plant is operated in con-

nection with the production of coal from a particular mine in order to prepare the coal (other than run-of-mine) for marketing.

Nor does it make any difference, in determining whether a preparation plant is an "adjunct" of a mine, whether the preparation plant is operated by the same firm that does the mining, or whether it is operated by a firm other than the one doing the mining of the coal. The provisions of MPR 120 nowhere require that the operator of the mining operation and the operator of the preparation plant must be one and the same person. On the contrary, the definition of the word "producer" in Section 1340.208 of MPR 120 clearly categorizes a producer as *either* of two classes of persons: (1) Those "engaged in the business of mining bituminous coal," and (2) those engaged in "preparing bituminous coal at a preparation plant which is an adjunct of a mine." The definition uses the word "or" in setting apart these two classes in the definition, and clearly shows an intention to describe in the alternative these two groups.

As a general rule, the same firm which does the mining of the coal, also operates the preparation plant. However, the Administrator, no doubt, foresaw the possibility that persons may attempt to evade the provisions of MPR 120 if he did not clearly indicate that the regulation aimed to control in its entirety the normal coal producing functions from mine to market at the "producer" level with one set of ceiling prices for the marketing of the coal at that level; and the Administrator aimed in his definition of "producer" to put everyone on notice that leasing out any one of the normal operations which are inherent in the operation of a coal mine and its adjacent preparation plant, would not be permitted to effect an "out" for either the producer or for the lessee. Otherwise, it would be impossible to control the price of coal at the producer level if it could be evaded by having the firm which mines the coal, lease out the preparation plant, and if the lessee could then say that because he was not the same person as the mining company, the provisions of MPR 120 should not apply to him. The use of such a middleman in the

coal mining business as a device for evading the price limitations of MPR 120 is thus clearly prevented by the express definition of the word "producer," which plainly applies to everybody participating in the various steps which are normally involved in the business of mining and preparing coal for market at the producer level.

In the adjudication of the questions now before the Court, consideration has been given to the supporting affidavit and letter presented by the defendant, Sterling Fuel Company, which is an authorization from the District Price Attorney to sell the coal handled by Sterling Fuel Company under the provisions of MPR 122. The Government, however, contends that this statement should not be considered as final and conclusive for the reason that at the time it was given, the District Price Attorney of the Office of Price Administration had not been given the full and complete facts as to the circumstances under which Sterling Fuel Company was to operate. Furthermore that if the full and complete facts had been given to the Office of Price Administration the authorization referred to in the affidavit would not have been given since the full and complete factual situation had not been entirely or correctly presented. There is no question that if the circumstances pertaining to the affidavit and letter attached thereto were admitted, the use thereof by the Court in passing upon the question as to whether or not the complaint should be dismissed would be final and conclusive. Gallup v. Caldwell, 3 Cir., 120 F. 2d 90, 92; Boro Hall Corp. v. General Motors Corp. et al., 2 Cir., 124 F.2d 822, 823.

As a result of the position of the Government in connection with the matter set forth in the affidavit and accompanying letter from the District Price Attorney, a question of fact arises as to whether or not the plaintiff in these cases should be bound by the action of the District Price Attorney, and if said letter would be a defense as to either or both of said defendants. The motion to dismiss in each instance was filed on the basis of Rule 12(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, on the theory that in each instance the Government has failed to set forth in its complaint a claim upon which

578

relief can be granted in favor of the Government and against each defendant.

■ In the consideration of a motion to dismiss a complaint, the only facts which the defendant admits are the truth of the allegations that are well pleaded. Lucking et al. v. Delano, 6 Cir., 129 F.2d 283.

The Government sets forth in each complaint that the defendants violated the provisions of MPR 120 in that the processing plant was operated as above set forth in an effort to circumvent and evade the provisions of said regulation which would govern the operation as an adjunct of the mine operated by Collins & Schweinberg & Company. In support of this position, the Government contends that it was intended by Collins & Schweinberg & Company to operate said processing plant as an adjunct of said mine for the reason that Collins & Schweinberg & Company made application for the fixing of prices on eleven different groups of coal. That without the use and operation of the processing plant as an adjunct of their mine, there would have been no basis or reason to secure prices for the eleven different size groups of coal referred to in MPR 120. That the truth of this position is best exemplified when consideration is given to the fact that in the operation of a strip mine, the only type of coal that can be produced is run-of-the-mine coal and that it was, therefore, necessary to make use of the processing plant to secure for production and sale the ten other size groups of coal.

■■ It is a settled principle of law that a complaint should not be dismissed unless it appears to a certainty that the plaintiff would not be entitled to relief under any set of facts which could be proved in support of the allegations set forth therein. Also, the complaint should be viewed in a light most favorable to the plaintiff, and the truth of the facts well pleaded, including facts alleged on information and belief, or admitted. Continental Collieries, Inc., v. Schober, Jr., 3 Cir., 130 F.2d 631; Federal Rules of Civil Procedure, Rules 8(f) and 12 (b) (6), 28 U.S.C.A. following section 723c; Carroll et al. v. Morrison Hotel Corp., 7 Cir., 149 F.2d 404; Garbutt v. Blanding Mines Co., 10 Cir., 141 F.2d 679;

Galbreath v. Metropolitan Trust Co. of California et al., 10 Cir., 134 F.2d 569.

■ A motion to dismiss cannot be used as a substitute for a trial on the merits. In these cases an issue of fact exists as appears from the affidavit filed in this case together with the letter attached thereto, which has been presented by the defendants. The government states that said letter would not have been written if the true facts had been known. The case is, therefore, not one for decision on a motion to dismiss, but should be based and considered when all evidence in connection with the issues raised can be presented, or a decision should not be made until a trial on the merits has completely and fully been held. Brookshire et al. v. Whittemore, D.C., 2 F.R.D. 549; Tylor Fixture Corp. v. Dunn & Bradstreet, Inc., D.C., 3 F.R.D. 258.

■ I believe that allegations of fact are set forth in each of the complaints, which, if proved and established in accordance with the measure of proof required by law, the Government would be able to support a right of recovery against each of the defendants as far as its claim for civil damages is concerned. If the defendants are not sufficiently informed as to any matter which has been alleged or about which complaint has been made, they have the right and privilege under the Federal Rules of Civil Procedure to either file a motion for a more definite complaint or a Bill for Interrogatories before filing their responsive pleading.

Congress has specifically provided that the Emergency Price Control Act, regulations, orders, price schedules and requirements as were made during its effectiveness, shall be treated as still remaining in force for the purpose of sustaining any proper suit, action, or prosecution with respect to any such right, liability or offense. 59 Stat. 306, 60 Stat. 664, 50 U.S.C.A.Appendix, § 901.

Under the circumstances, in connection with the claims for money damages, the motion to dismiss the complaint in each instance is refused.

However, in each of the complaints the Government has set forth claims for injunctive relief.

A writ of injunction can never be used to punish for past offenses, but it should be granted only to stop existing or threatened violations. Consideration should, therefore, be given as to whether the acts were willfully or innocently done, will they be repeated, will irreparable injury come to the public, or will the interests of the public be best served with some other form of relief? Bowles v. Surft Co., D.C., 56 F.Supp. 679; Swift & Co. v. United States, 276 U.S. 311, 48 S.Ct. 311, 72 L.Ed. 587; Walling v. Shenandoah Dives M. Co., 10 Cir., 134 F. 2d 395; Bowles v. Carnegie-Illinois Steel Corp., 7 Cir., 149 F.2d 545; Brown v. Conner, D.C., 63 F.Supp. 315; Bowles, Price Administrator, v. Hall and Holliday, D.C., 62 F. Supp. 486.

Congress has seen fit to provide that all regulations, orders, price schedules and requirements under the provisions of the Emergency Price Control Act of 1942 shall terminate on June 30, 1947, or upon the date of a proclamation of the President or upon the dates specified in a concurrent resolution of the two houses of Congress, declaring that the further continuance of the authority granted by said Act is not necessary in the interest of the national defense and security, whichever date is the earlier. 59 Stat. 306, 60 Stat. 664, 50 U.S. C.A.Appendix, § 901.

Price controls in connection with the manufacture and sale of coal were lifted by Presidential Statement on November 9, 1946. 15 L.W. 2272. On November 10, 1946, Price Administrator issued SO 193, following the Presidential Order ending virtually all price controls. As a result there is now no existing provision in the Act or regulations thereunder which could be enjoined or an order made to comply therewith.

Since an injunction is relief granted to prevent future misconduct and cannot be issued to prevent a practice which has been definitely and permanently discontinued, or which becomes a moot question by operation of law, this Court is without authority to grant any of the requests for injunctive relief which are set forth in each of the complaints in these cases. Walling v. Shenandoah Dives Mining Co., 10 Cir., 134 F.2d

395; Bowles v. Carnegie-Illinois Steel Corp., 7 Cir., 149 F.2d 545.

The motion to dismiss in each of said cases as far as the claim of the Government for injunctive relief in any respect is granted.