UNITED STATES of America

v.

NATIONAL CITY LINES, Inc., et al.

No. 49 C 1364.

United States District Court
N. D. Illinois.

Sept. 19, 1955.

Earl A. Jinkinson, Sp. Asst. to the Atty. Gen., Ralph M. McCareins, Sp. Asst. to the Atty. Gen., Harold E. Baily, Trial Atty., Chicago, Ill., for plaintiff.

Howard Ellis, A. Leslie Hodson, Karl F. Nygren, Chicago, Ill., Joseph Thomas, Akron, Ohio, for defendant Firestone Tire & Rubber Co. Kirkland, Fleming, Green, Martin & Ellis, Chicago, Ill., of counsel.

Ferris E. Hurd, Chicago, Ill., Henry M. Hogan, Detroit, Mich., for defendant General Motors Corp. Pope & Ballard, Chicago, Ill., of counsel.

Edward R. Johnston, Chicago, Ill., for defendant Phillips Petroleum Co. Johnston, Thompson, Raymond & Mayer, Chicago, Ill., of counsel.

Harlan L. Hackbert, Chicago, Ill., for defendant Mack Manufacturing Corp. Stevenson, Conaghan, Velde & Hackbert, Chicago, Ill., of counsel.

H. Templeton Brown, Chicago, Ill., for defendants Standard Oil Co. of California and Federal Engineering Corp. May-

er, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., of counsel.

HOFFMAN, District Judge.

This suit was brought by the United States of America under the provisions of Section 4 of the Sherman Antitrust Act, 15 U.S.C.A. § 4, 26 Stat. 209, to enjoin violations of that Act. This proceeding is the remaining vestige of a controversy that first entered the courts in 1947, when the Government commenced this suit and a companion criminal action in the District Court for the Southern District of California. Named as defendants in both actions were two groups of corporations. The first group, hereafter called collectively the City Lines defendants, was composed of National City Lines, Inc. (hereafter National), a Delaware corporation and holding company for some forty-six local public transportation companies in sixteen states, Pacific City Lines, Inc. (hereafter Pacific), also a Delaware corporation, since dissolved, and then a subsidiary of National operating or managing certain of the local transportation companies owned or controlled by National in California, Washington, and Utah, and American City Lines, Inc. (hereafter American), a Delaware corporation and a subsidiary of National organized to operate and manage local transportation companies owned or controlled by National in large metropolitan centers. American was, in 1946, merged into National. The second group of corporate defendants, hereafter referred to collectively as the supplier defendants, comprised six corporations which supplied the City Lines defendants and their operating companies with the motor buses, petroleum products, tires and tubes used in their operations. The supplier defendants include: General Motors Corporation, in its own behalf and as successor to Yellow Truck and Coach Manufacturing Company, a former subsidiary; Mack Manufacturing Corporation, a Delaware corporation; Phillips Petroleum Company; Standard Oil Company of California and its wholly-owned subsidiary, Federal Engineering Corporation; and The Firestone Tire & Rubber Company. These suppliers will be called, respectively, General Motors, Mack, Phillips, Standard, Federal, and Firestone. Seven individuals, officers or directors of the defendant corporations, were also joined as defendants in the criminal action but not in the civil case.

Briefly summarized, the offense with which these defendants were charged in both actions was a conspiracy, beginning in 1937, to acquire or to control a substantial part of the local transportation companies in the various cities of the United States and to restrain and to monopolize the interstate commerce in motor buses, petroleum products, tires and tubes used by the companies so acquired and by those already controlled or subsequently acquired by the City Lines defendants. This conspiracy, it was charged, was implemented by the supplier defendants' furnishing money and capital to the City Lines defendants, in return for which the City Lines agreed, on behalf of themselves and the operating companies then controlled or subsequently acquired, to purchase substantially all of their requirements of motor buses, petroleum products, tires and tubes from the respective supplier defendants to the exclusion of competitors.

Both the criminal and the civil actions were, upon motion of the defendants, transferred to this court for trial. The criminal case was tried in 1949, and the jury returned a verdict of guilty on one count of the indictment charging a violation of Section 2 of the Sherman Act, and a verdict of acquittal on the other count, which charged a violation of Section 1. The conviction was affirmed upon appeal, in United States v. National City Lines, 7 Cir., 1951, 186 F.2d 562, and a petition for a writ of certiorari was denied. 1951, 341 U.S. 916, 71 S.Ct. 735, 95 L.Ed. 1351.

The United States filed a supplemental complaint in this civil action setting up the criminal conviction, and thereafter moved for summary judgment in its favor on the basis of this prior adjudica-

tion. This motion was granted in part upon grounds more fully stated in a reported opinion of this court. United States v. National City Lines, D.C.1953, 118 F.Supp. 465. Summarily stated, we there held that the facts necessary to support a conviction under the count of the indictment upon which the defendants had been found guilty should not be relitigated. Upon a consideration of the indictment, the evidence, and the opinion of the Court of Appeals in the criminal case, it was decided that a violation of Section 2 of the Sherman Act had been conclusively established for purposes of this case and that this violation consisted of a conspiracy to monopolize the sale of supplies used by the local transportation companies controlled by the City Lines defendants. An order of partial summary judgment, in the nature of a pretrial order under Rule 16, Federal Rules of Civil Procedure, 28 U.S.C.A., was accordingly entered on February 26, 1954. By this order it was established for purposes of the trial of this proceeding that all of the defendants had conspired or combined to monopolize interstate commerce through the contracts, entered into between the City Lines defendants and the individual supplier defendants, by which the City Lines defendants agreed to purchase their requirements of motor buses, petroleum products, tires and tubes from the supplier defendants, and that these acts were committed with the intent required for, and constituted, a violation of Section 2 of the Sherman Act. The plaintiff was thereby relieved of the burden of proving these matters, and the defendants were foreclosed from refuting them.

As a result of this order, the present controversy was narrowed to first, the question of the need for equitable relief to prevent recurrence of this established violation of Section 2 of the Sherman Act, and second, the question of whether the defendants had violated Section 1 of the Sherman Act by conspiring to restrain trade by acquiring control of a substantial part of the local transportation companies in the cities of the United States, the offense of which the defendants had been accused but acquitted in the criminal case. The alleged violation of Section 1 and the charge of a conspiracy to acquire control of local transportation companies have since been abandoned by the Government, leaving only the issues of appropriate equitable relief under the established violation of Section 2.

The scope of the controversy has been still further diminished by a consent decree entered by this court upon the agreement of the Government and the existing City Lines defendants on December 14, 1954. This decree directs the defendant National to take all action within its power to cancel certain remaining supply contracts between National, its subsidiaries or affiliates, and some of the supplier defendants, enjoins National from entering into any supply contracts conditioned upon the supplier's financing the operations of the transit company supplied, and establishes a bidding procedure for contracts for the purchase of petroleum products and tires and tubes. Jurisdiction has been retained for carrying out, modifying, or enforcing this decree.

With the City Lines defendants eliminated from the controversy by this decree, the only issue remaining for trial was the equitable relief to which the Government might be entitled against the supplier defendants, relating to the violation of Section 2 of the Sherman Act established in the criminal action.

This remaining issue has been tried upon the basis of the record of the criminal case, depositions of various witnesses, interrogatories submitted by the Government and the defendants' answers thereto, additional documentary and oral evidence, and the stipulations of counsel. The court has had the benefit of very helpful and exhaustive briefs presented on behalf of all parties, and the controversy, or this final remnant of it, is now ripe for decision.

The only question to be decided is of the necessity and propriety of injunctive relief. As the Supreme Court

has admonished, "It will simplify consideration of such cases as this to keep in sight the target at which relief is aimed. The sole function of an action for injunction is to forestall future violations." United States v. Oregon State Medical Society, 1952, 343 U.S. 326, at page 333, 72 S.Ct. 690, at page 695, 96 L.Ed. 978. With this purpose in view, the prayers for relief as set forth in the Government's complaint will be considered.

The first prayer of the complaint requests that the court adjudge and decree that the defendants have engaged in an unlawful combination and conspiracy in violation of Sections 1 and 2 of the Sherman Antitrust Act. As to the alleged violation of Section 2, this aim has already been achieved by the Government. This court and the Court of Appeals for this Circuit have adjudicated the defendants' guilt in the criminal action, and the finality of this determination has been recognized in this proceeding by the prior ruling upon the motion for summary judgment. Nothing that this court could now decree would add weight or force to those findings. So much of the prayer as requests an adjudication that the defendants violated Section 1 of the Sherman Act has been abandoned by the plaintiff in its briefs. Nothing remains to be granted, therefore, under this prayer.

The second prayer for relief is that the supplier defendants be required to divest themselves of all common and preferred stock or other financial interest in the defendants National, American, Pacific, and their operating companies. It is established by the evidence, and it is uncontroverted by the plaintiff, that all of the supplier defendants have disposed of their investments in the City Line companies and their subsidiaries, and that no supplier defendant has, since 1952, held any financial interest in these companies. This requested relief having already been obtained without the compulsion of a decree, no divesting order is required.

In the third prayer of the complaint the plaintiff seeks a declaration that all sales or investment contracts, written or oral, between the supplier defendants and the City Lines defendants and their operating companies are void, unenforceable, and of no legal effect. Since the investment contracts have all been abandoned or canceled, any such declaration as to them would be futile. Similarly, most of the sales contracts between the City Lines and the supplier defendants have expired or have been canceled. Those remaining in force at the time of trial are considered with the issues raised by the sixth prayer, below.

The fourth and fifth prayers for relief relate solely to the City Lines defendants, and request no relief directed against the supplier defendants. In view of the final judgment rendered in the consent decree of December 14, 1954, dropping the City Lines defendants from the case, there is no need to consider these prayers.

The core of the controversy between these parties is the prayer for orders controlling the future conduct of the supplier defendants as set forth in the sixth prayer of the complaint in this case. That prayer requests:

"6. That the defendants herein and each of them and their officers, directors and representatives and all persons and corporations acting or claiming to act on behalf of them be perpetually enjoined and restrained from combining and conspiring to monopolize, or to restrain interstate trade and commerce of the United States in the manner and by the means described herein, and be perpetually enjoined from engaging in or participating in agreements, understandings, practices or arrangements having a tendency to revive or continue any of the aforesaid violations of the Sherman Antitrust Act."

Several principles of decision are called into play when a court is requested to exercise the injunctive power conferred by Section 4 of the Sherman Antitrust Act. In the first instance it must

be kept in mind that the power so conferred is to be exercised in accordance with the general principles which traditionally have obtained in courts of equity and have controlled the granting of equitable relief. De Beers Consolidated Mines v. United States, 1945, 325 U.S. 212, 218–219, 65 S.Ct. 1130, 89 L.Ed. 1566. Heed must be paid to the usual limits of equitable discretion and to the factors ordinarily affecting that discretion.

A major point of conflict between the parties here is the interpretation to be given to the quoted language of the sixth prayer of the complaint—whether the prayer is to be construed, as the Government contends, as requesting a general prohibition against all practices associated with or related to the type of offense established in the criminal case, or whether, as the defendants argue, the request for relief is to be read as praying only for whatever decree may be necessary to prevent a repetition of the same offense already proved. Consideration of the proper breadth of the decree which may be entered requires that a delicate balance be struck. On the one hand, the relief afforded must be adequate to meet the need. An injunction must be broad enough to prevent a repetition of the wrong, and a mere deviation in the method by which the same evil is accomplished cannot be permitted to evade the prohibition. Accordingly, a decree may close all roads to the prohibited goal, and is not confined to the well-worn road. International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20. The judge, in assuring the public freedom from the illegal conduct, may range broadly through practices connected with acts actually found to be illegal. United States v. United States Gypsum Co., 1950, 340 U.S. 76, 88, 71 S.Ct. 160, 95 L.Ed. 89.

On the other hand, a finding of an offense under the antitrust laws does not invest a court with a license to embark upon a general program of comprehensive control of the defendants' business. The limits of the controversy must be observed. The court is "bound by the first principles of justice not to sanction a decree so vague as to put the whole conduct of the defendants' business at the peril of a summons for contempt. We cannot issue a general injunction against all possible breaches of the law." Swift & Co. v. United States, 1905, 196 U.S. 375, at page 396, 25 S.Ct. 276, at page 279, 49 L.Ed. 518. "[T]he mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged." N. L. R. B. v. Express Publishing Co., 1941, 312 U.S. 426, 435–436, 61 S.Ct. 693, 699, 85 L.Ed. 930. To range far beyond the hard facts of the questions actually tried in the case is to invite the errors of a broad rule which proves unjust in the light of unforeseen circumstances. The court is constrained, then, to steer the narrow course between the hazards of a failure to cure the evil on one side and unwarranted and oppressive control on the other. In its essence, the principle involved is simply that we should not attempt to accomplish in a single suit what should fairly be left to a later action when and if it proves necessary.

In reviewing the language of the plaintiff's prayer for relief in the light of these considerations, the reader must take into account the nature of the offense charged and actually litigated by the parties. Under the liberal provisions of Rule 54(b) of the Federal Rules of Civil Procedure, the plaintiff is not bound to prove all that he alleges, nor is he limited in a judgment in his favor to the relief he has demanded in his complaint. Under that Rule, a litigant is to be awarded whatever relief the facts as litigated entitle him to. But in determining what is fairly within the boundaries of the controversy, the distinction between a civil action brought on behalf of the United States and a civil action brought

on behalf of a private person cannot be ignored. "The Government seeks its injunctive remedies on behalf of the general public; the private plaintiff, though his remedy is made available pursuant to public policy as determined by Congress, may be expected to exercise it only when his personal interest will be served." United States v. Borden Co., 1954, 347 U.S. 514, 518, 74 S.Ct. 703, 706, 98 L.Ed. 903. Reasonable limits are set for the private suit by the limits of the plaintiff's interests at stake, and the defendant is put on general notice by the nature of the opposing litigant of the extent of the possible controversy. But when the Government is the civil plaintiff, the scope of the interests to be protected by an injunction is as broad as the national economy. In such cases, principles of elemental fairness demand that the bounds of the issues relating to injunctive relief be determined with reliable certainty by the pleadings.

A related principle which serves as a guide in a case such as this is the salutary rule that questions of law are to be decided so far as possible only upon the basis of fully litigated and established facts. Basic to this judicial system is the court's duty to refuse to lay down a rule for controlling predicted future conduct upon the shifting foundation of a prophecy as to future conditions. United States v. Hamburg-Amerikanische Packetfahrt-Actien Gesellschaft, 1916, 239 U.S. 466, 36 S.Ct. 212, 60 L.Ed. 387. In so far as the injunctive relief requested by the Government would involve decision of doubtful legal propositions in the abstract, without full presentation of the variable circumstances which might affect the resolution of the question, the court must proceed with caution. The competitive freedom which the Sherman Act was designed to preserve is no better served when a competitor is destroyed by unwarranted injunction than when he is destroyed by unlawful practices.

A third principle called into play in this suit is the rule that the extraordinary remedy of injunction will be afforded only to prevent wrongs reasonably apprehended in the future. A court should not employ its carefully drawn powers for a vain and useless purpose. The function of the injunction is neither vindictive nor punitive. The fact that an offense may have been committed in the past means nothing except in so far as in some cases it may show a likelihood of recurrence of the unlawful conduct; it does not raise any presumption of a general propensity for wrongdoing. "The sole function of an action for injunction is to forestall future violations. It is so unrelated to punishment or reparations for those past that its pendency or decision does not prevent concurrent or later remedy for past violations by indictment or action for damages by those injured. All it takes to make the cause of action for relief by injunction is a real threat of future violation or a contemporary violation of a nature likely to continue or recur." United States v. Oregon State Medical Society, 1952, 343 U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978. On the other hand, protestations of contrition or repentance by a proven offender must, in the light of human experience, be viewed with a grain of suspicion. Injunctive relief is denied in cases where no danger of repeated wrongs has been shown not out of consideration for the adjudicated wrongdoer, but because of the limited purpose of the remedy of injunction.

Against these general principles as a background, the salient facts can be seen more clearly. Since a violation of the Sherman Act, 15 U.S.C.A. §§ 1-7, 15 note, by these defendants was conclusively established in the criminal case begun as a companion to this suit, and since the only relevant inquiry at this stage is the prospect of wrongdoing ahead, no extended archeological investigation into the history of the defendants' violation is appropriate. Briefly summarized, the evidence introduced in the criminal proceeding shows that in the middle 'thirties National was engaged in the pursuit of taking over local transportation systems in various cities throughout the country. Most of the companies taken over employed street cars, and it was National's practice to convert these

systems to the use of motor buses. The supplies needed for the operation of these local transportation companies were obtained from these supplier defendants and from competing suppliers as well. National was interested in raising additional capital to finance its activities, and after a series of communications among the supplier defendants and the City Lines, General Motors, Mack, Standard, Phillips, and Firestone invested a total amount in excess of nine million dollars in the securities of the City Lines, first in National and Pacific in 1938 and 1939, and, when it was subsequently organized in 1943, in American. In return for these investments, the supplier defendants received supply contracts which obliged the City Lines defendants and their existing and future subsidiary operating companies to obtain substantially all of their requirements of motor buses from General Motors and Mack, their requirements of petroleum products from Phillips and Standard, and their requirements of tires and tubes from Firestone. The offense of which the defendants were convicted in the criminal case consisted in a conspiracy to use this combination of investment and requirements contracts to monopolize interstate commerce in supplies used by the numerous transportation companies owned or controlled by the City Lines defendants. The conviction as sustained on appeal establishes that these arrangements excluded competitors from a substantial part of a separable market so as to constitute monopolization within the meaning of Section 2 of the Sherman Antitrust Act. The conviction also establishes that the defendants engaged in this concerted action with the requisite intent to monopolize.

Although the past violation was committed by the supplier defendants acting in concert, individual consideration is required for resolution of the question of appropriate equitable relief. A brief résumé of the evidence relating to each of the suppliers on this question is therefore pertinent.

*General Motors.* Until 1943, General Motors engaged in the occurrences here involved through a controlled corporation, Yellow Truck & Coach Company; upon the merger of this company with General Motors in 1943, General Motors succeeded to its former subsidiary's interests in the contracts with the City Lines. As the result of investments made in Pacific in 1938 and in National in 1939, General Motors obtained contracts which bound these corporations and their operating companies to buy from General Motors 85% of their requirements of new buses purchased for transportation companies controlled on the date of the contract, and 42½% of the requirements of new buses purchased for companies to be acquired or organized in the future. Before they learned of the Government's investigation into these dealings, the management of General Motors resolved to dispose of the City Lines holdings, and the last of these investments was sold in 1949. All of the requirements contracts between General Motors and the City Lines defendants were canceled in 1949, after the conviction in the criminal case. General Motors now holds no investment in, and has no requirements contracts with, any local transit company, either in or out of the City Lines system. Evidence was introduced to show that General Motors has no intention of making any investments in the City Lines defendants, and no intention of entering into any requirements contracts with them.

*Mack.* The evidence relating to this defendant shows that in 1939 Mack purchased certain preferred stock in National and received in return a contract by which National agreed that its subsidiaries subsequently formed or acquired would obtain 42½% of their requirements of new buses from Mack. The term of the contract was ten years; it expired in 1949, and no other requirements contracts between Mack and the City Lines defendants were shown. In 1940, Mack also purchased stock of Pacific, which it sold in 1941. The National stock was redeemed for cash in

1944, and since that time Mack has held no investment in any City Lines defendant.

*Phillips.* As the result of its investments, Phillips was awarded contracts for the sale of the petroleum products required by the operating companies controlled by the City Lines defendants in the central regions of the United States. One of the obligations of these contracts required the City Lines defendants to use the proceeds of the sale of any assets of a company in Phillips' contractual territory for re-investment in that territory. All of the Phillips holdings in the City Lines were disposed of in 1949, and Phillips has no intention to invest in these companies in the future. The last of the requirements contracts between Phillips and any of the City Lines defendants expired in 1953.

*Standard.* Standard made its investments in the City Lines through its wholly owned subsidiary, Federal Engineering Corporation, named as one of the defendants in this suit. In return for these investments, Standard obtained contracts to supply the petroleum requirements of the City Lines operating companies in the western United States, and particularly in California, Washington, and Utah. Standard disposed of its common stock holdings in the City Lines in 1949, and of its preferred stock in 1952, and has introduced evidence that it has no intention of making future investments in any of the City Lines defendants. At the time of trial, all of Standard's requirements contracts had expired or been canceled except for an agreement with Pacific and agreements with two operating companies, Salt Lake City Lines and Los Angeles Transit Lines. The date of expiration of all three of these contracts is April 30, 1956.

*Firestone.* Beginning in 1939, Firestone made investments in National, Pacific, and American, and received in return contracts to supply the needs of tires and tubes of the City Lines operating companies. Under the prevailing practice in this trade, local transportation companies ordinarily obtain their required tires and tubes not through purchase but through a rental arrangement under which the tire supplier leases tires and tubes on a mileage-rate charge, maintaining an available inventory of supplies and providing service and maintenance personnel. Such arrangements tend to be of substantial duration, and Firestone's agreements with the City Lines defendants were tire-mileage contracts of this character. Firestone disposed of its City Lines investments in 1951. All of its requirements contracts with City Lines companies had been canceled or had expired at the time of the trial except for contracts with Long Beach Transit Lines and Los Angeles Transit Lines. Both of these existing contracts were scheduled to expire according to their terms on May 31, 1955, and under the provisions of the consent decree previously entered in this case National was ordered to take all action within its power to cancel these contracts. It is stated in the brief filed on behalf of Firestone that the Long Beach contract has been canceled since the trial, but no evidence of that fact has been introduced and the Government is apparently unwilling to concede the point. Firestone also offered evidence that it did not intend to invest in any of the City Lines defendants in the future.

The plaintiff has introduced no evidence in support of its allegation in the complaint that "Defendants threaten to and will continue to violate Sections 1 and 2 of the Sherman Antitrust Act unless the relief hereinafter prayed for is granted." There is nothing in the record beyond the implication of the past violation which tends to show any danger of future wrongs. The good faith and genuineness of the defendants' statements that they do not intend to invest in the City Lines defendants are impeached by nothing offered in the case.

In this state of the record, the sixth prayer of the complaint, requesting an injunction against conspiring to monopolize commerce "in the manner and by the means described" in the complaint and from engaging in practices "having a

tendency to revive or continue any of the aforesaid violations," is to be considered.

In its post-trial brief the Government has interpreted and elaborated this prayer to request the following six forms of specific relief: First, enjoining each defendant from entering into a requirements contract with any transit company except a contract for the supply of tires and tubes for a period of five years or less or for the sale of petroleum products for one year or less; second, enjoining each defendant from entering into a contract with any transit · company which obliges the transit company to cause its subsidiaries to purchase their needs from the supplier, or which restricts the transit company in the kind of equipment or supplies it may use, or which limits the transit company in the disposition of its assets and equipment; third, enjoining each defendant from financing the operations of any transit company upon an agreement of the transit company to purchase its supplies from the defendant; fourth, enjoining each defendant from combining, conspiring, or agreeing with another supplier defendant or with any other supplier to finance the operation of any transit company upon an agreement of the transit company to purchase its required supplies from the defendant; fifth, enjoining each defendant from acquiring any financial interest in or participating in the management of National or its subsidiaries or affiliates; and sixth, requiring the cancellation of all remaining requirements contracts between the supplier defendants and the City Lines defendants which were made in furtherance of the conspiracy.

Testing these requests against the prayers for relief contained in the complaint and the issues that have been litigated in this proceeding reveals that the relief · sought exceeds the boundaries of the controversy in several particulars. The first four of these specifications made for the first time after the trial seek to enjoin each of the defendants from entering into various relationships with *any* transit company or, in the fourth specifi-

cation, *any* other supplier. To grant such an order could carry the court far toward the general injunction to obey the law condemned in Swift & Co. v. United States, 1905, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518, and N. L. R. B. v. Express Publishing Co., 1941, 312 U.S. 426, 435–436, 61 S.Ct. 693, 85 L.Ed. 930. The conspiracy in which the defendants engaged was not national in scope, and did not involve any attempt to monopolize a whole industry. The combination charged in the criminal indictment of a conspiracy to acquire a substantial part of the local transportation companies throughout the United States was not established, and that charge has here been abandoned. The only offense litigated in this case was a conspiracy limited to the monopolization of sales to a single corporate system, the City Lines defendants and their operating companies. No evidence of the relations of the supplier defendants with any other transit companies has been introduced and the record is bare of any support for the supposition that there is a cognizable danger of future violations with respect to the transit companies. An injunction should be limited by the circumstances involved in the litigation. By way of example of this principle, in Swift & Co. v. United States, 1905, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518, the Court, speaking through Mr. Justice Holmes, amended on its own motion an injunction against restrictive practices in any livestock sales to confine the prohibition to sales at the stock yards named in the bill. 196 U.S. at page 400, 25 S.Ct. 276. More recently, in United States v. W. T. Grant Co., 1953, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303, the Court read a prayer for an injunction against an "aforesaid violation" of the antitrust laws literally, as limited to the violation charged in the complaint, and accordingly sustained the lower court's denial of a requested injunction against similar violations committed with other persons or corporations. Without fair apprisal of these broad claims and without having litigated the questions raised by these specifications, the defendants should not be subjected to the risk of

contempt in all their dealings with transit companies and other suppliers. The first four specifications of relief must therefore be regarded as beyond the scope of this case. If relief is to be granted in these particulars, it must be awarded in a suit in which the facts are fairly litigated. The offense here established cannot be made to reach so far.

A related objection to these first four specifications of the plaintiff's interpretation of the sixth prayer of the complaint is to be found in the fact that the legality of the arrangements and practices sought to be outlawed has not been tried. As previously noted, difficult questions of law are not to be decided in hypothetical cases, but upon the concrete facts of an actual lawsuit. The temptation to resolve all doubtful legal questions against the proven wrongdoer must be put aside; a vindictive temperament has no place in a court dispensing equitable relief. The practices which the Government seeks to enjoin are not matters of outright lawlessness or brazen price-fixing. Whether or not these practices are illegal under the antitrust laws turns upon nuances of circumstance which cannot be foreseen or determined in advance of the event. For example, the first specification of relief of the plaintiff's post-trial brief requests that the defendants, and each of them, be enjoined from entering into any requirements contract with any transit company, with exceptions for tire-supply contracts up to five years in duration and petroleum-supply contracts for one year or less. Such an injunction would of course place the defendants at a competitive disadvantage. Requirements contracts are not illegal per se, as the Government concedes by the exceptions to its request in the case of tires and petroleum products, and as it conceded in the consent decree heretofore entered by permitting National and its operating companies to enter into requirements contracts for relatively short terms. Even under the specific prohibitions of Section 3 of the Clayton Act, 15 U.S.C.A. § 14, the legality of a particular requirements contract is a matter of more or less. See, e. g., Standard Oil Co. of California & Standard Stations v. United States, 1949, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371. What might offend the broader provisions and the tests of reasonableness of the Sherman Act, here involved, has not been articulated by the Supreme Court. Whether a contract for supplying a local transit company's requirements of motor buses, or its requirements of tires for longer than five years, or its requirements of petroleum products for longer than one year, would be unlawful should not be decided until the circumstances surrounding the agreement are properly before a court. In some situations a requirements contract will be no more restrictive of competition than a single sale of a large quantity of supplies. In the criminal action prosecuted as a companion to this case, the trial judge instructed the jury, "it is not unlawful to make a requirements contract," and continued, "nor was the execution of the several supplier requirements contracts in itself unlawful * * *." Assuming that this ruling does not establish the law of the case or raise an estoppel, it is enough that the controversy here litigated does not fairly present this question of law.

Similar considerations control the legal questions raised by the third specification of the plaintiff's requests for relief, in which the Government requests that each defendant and the defendants collectively be enjoined from making investments in any transit company upon an agreement of the transit company to purchase its requirements from the supplier. As requirements contracts are not illegal per se, it is not necessarily unlawful for a supplier to help a customer financially, whether by extending liberal credit, making a loan, or investing capital. How far the combination may be carried without violation of the Sherman Antitrust Act is difficult to determine prospectively. In some circumstances such an arrangement is no doubt permissible. The trial judge who entered the judgment of guilty in the

companion criminal case observed, in his charge, that "the making of an investment by each supplier defendant in the preferred and common stock of National, American and Pacific, was not in itself unlawful; nor was the execution of the several supplier requirements contracts in itself unlawful, whether or not made in connection with the investment." And the Court of Appeals for this Circuit, which sustained the criminal conviction of these defendants, has since found unobjectionable under the Sherman Act an analogous arrangement whereby a purchaser invested in the seller's stock upon the seller's agreement to sell its manufactures exclusively to the purchaser. Fargo Glass & Paint Co. v. Globe American Corp., 7 Cir., 1953, 201 F.2d 534. Any commercial dealing necessarily excludes others from making the same sale; only when preclusion reaches a substantial part of the market does it amount to the monopolization condemned by the Sherman Act. United States v. Columbia Steel Co., 1948, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533. It has been litigated and decided that it is illegal to foreclose the sale of buses, tires, and petroleum products used by forty-six local transportation systems in forty-five cities and sixteen states. How much less would suffice has not been here tried. It follows that the plaintiff's request to enjoin all such arrangements as unlawful is too broad.

But the basic objection underlying all the specifications of relief but the sixth, hereafter considered, is the absence of any proven necessity for such relief. Except for the contracts between Standard and Firestone and the City Lines which were still in force at the time of trial, all the requirements contracts of the supplier defendants had been canceled or abandoned or had expired in 1953. All investments of the supplier defendants in the City Lines had been disposed of by 1952. No new investment or requirements arrangements had been entered into for a period of approximately eight years before this trial.

All of the defendants have introduced evidence that they have no intention of making investments in the City Lines defendants in the future. No evidence has been offered by the plaintiff to rebut or to contradict this testimony. The plaintiff has argued that only General Motors has declared that it has no intention to enter into requirements contracts with the City Lines, and from this it is inferred that the other suppliers must entertain such an intention. But the Government has conceded that requirements contracts for the supply of tires and petroleum products may be unobjectionable, and an absolute prohibition against exclusive supply contracts has been sought only in the case of motor buses. In view of General Motors' declared intention not to employ such contracts, and in view of the fact that the other bus supplier, Mack, was a party to only one requirements contract, made in 1939, and that in the last seven years of that contract Mack sold only $152,247 worth of buses to the City Lines and their subsidiaries, there appears to be no cognizable probability of a resumption of the requirements relationships in the defendants' sale of buses to the City Lines.

In these circumstances, no useful purpose would be served by enjoining the defendants from doing what there is no reason to believe they will do. Section 4 of the Sherman Act "confers on the Government no absolute right to an injunction upon a showing of past violation of the antitrust laws by defendants." United States v. Borden Co., 1954, 347 U.S. 514, 519–520, 74 S.Ct. 703, 707, 98 L.Ed. 903. "The purpose of an injunction is to prevent future violations, Swift & Co. v. United States, 1928, 276 U.S. 311, 326, 48 S.Ct. 311, 314, 72 L.Ed. 587, and of course it can be utilized even without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more

than the mere possibility which serves to keep the case alive." United States v. W. T. Grant Co., 1953, 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303. See also United States v. Oregon State Medical Society, 1952, 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978; United States v. United States Steel Corp., 1920, 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343; Walling v. Youngerman-Reynolds Hardwood Co., 1945, 325 U.S. 419, 65 S.Ct. 1242, 89 L.Ed. 1705. To the same effect are several decisions of the Court of Appeals for this Circuit, including Walling v. T. Buettner & Co., 7 Cir., 1943, 133 F.2d 306, 308, and Bowles v. Carnegie-Illinois Steel Corp., 7 Cir., 1945, 149 F.2d 545.

█ The fact that the illegal investments and requirements contracts were not terminated until after the suit was commenced might be regarded as suspect, as an indication that conscious wrongdoing has been ceased only temporarily for purposes of this proceeding. But the failure to cancel these arrangements as soon as they were called into question by the Government is also consistent with a *bona fide* belief of the defendants that there was nothing unlawful about the arrangements, and the court is not prepared to say that in the state of the law at the time the complaint was filed this belief could not reasonably be entertained. Moreover, termination of unlawful activities during the course of litigation need not be disregarded. Indeed, it may be sufficient to render a case moot. Standard Oil Co. of Indiana v. United States, 1931, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926; United States v. Hamburg-Amerikanische Packetfahrt-Actien Gesellschaft, 1916, 239 U.S. 466, 36 S.Ct. 212, 60 L.Ed. 387. While the action of the defendants in terminating the condemned arrangements during the pendency of this case is not, in the court's opinion, sufficient to deprive this court of its power to decide the question, this circumstance must be taken into account in determining whether equitable relief is needed to prevent future violation.

Much has already been accomplished by the Government. The unlawful investments and requirements contracts have been divested. The court is not persuaded that more is necessary to protect the public from a repetition of these or similar violations.

There remain, however, the requirements contracts obtained as a result of the unlawful conspiracy which were still in force at the time of trial. Since these agreements constitute part of the scheme of monopolization, they should be canceled. Standard's existing contracts with Pacific, Salt Lake City Lines, and Los Angeles Transit Lines, all expiring April 30, 1956, must accordingly be terminated, and the decree to be entered herein should contain a provision appropriate to that end. Unless it is made to appear before the entry of a decree herein that relief is unnecessary because the contracts have already expired or been canceled, there should be a similar provision to terminate Firestone's contracts, previously described, with Long Beach Transit Lines and Los Angeles Transit Lines. In other respects the issues are found in favor of the defendants, and the requested relief will be denied, without prejudice, of course, to the commencement of a later proceeding should it prove necessary.

Counsel are directed to confer and to present a final decree for the court's signature, in keeping with the views herein expressed, on or before September 30, 1955.