**UNITED STATES of America**

**v.**

**WARD BAKING COMPANY et al.**

**Civ. A. No. 31666.**

United States District Court
E. D. Pennsylvania.

June 21, 1965.

Walter L. Devaney, Antitrust Div., Carl J. Melone, Antitrust Div., U. S. Department of Justice, for plaintiff.

Charles A. Wolfe, Philadelphia, Pa., for defendant Ward.

VAN DUSEN, District Judge.

In this action, plaintiff seeks a finding that defendant Ward Baking Company [1] (hereinafter called "defendant") has engaged in a combination and conspiracy in unreasonable restraint of interstate trade and commerce in economy bread, in violation of § 1 of the Sherman Act (15 U.S.C. § 1), and an injunction perpetually enjoining defendant, its successors, assignees and transferees, as well

---

1. The other corporate defendants have consented to the entry of final judgments against them (see Documents Nos. 29, 32 and 36).

as its officers, agents and employees, from continuing to carry out or revive the alleged combination and conspiracy or from engaging in any other such combination or conspiracy. The Complaint has been filed under § 4 of the Sherman Act (15 U.S.C. § 4). Economy bread is defined in the Complaint as that class of white loaf bread sold in the Philadelphia-Trenton area at prices lower than white loaf bread of equivalent weight and size, allegedly known as "regular brand bread" or "commercial bread." The Complaint also alleges that economy bread is known in the trade as "secondary" or "cheap" bread. The background facts are stated in part at pages 71, 72 of the November 15, 1963, Opinion in United States v. Ward Baking Company, et al., Criminal No. 21123, 224 F.Supp. 66.

The testimony revealed that in the spring and summer of 1960, the General Baking Company, Freihofer Baking Company, and the Fischer Baking Company had a secondary or cheap loaf of bread which sold for 17¢ retail in the Philadelphia market (N.T. 230–2),[2] but that prior to July 18, 1960, at least three brands of economy bread (Twentieth Century, New Century and Dainty Maid, being defendant's economy bread) were being sold at 15¢ per loaf retail. At this time, and until July 25, 1960, Unity Bread (sold by Frankford-Quaker Grocery Co., which is alleged by plaintiff to be an active co-conspirator in the alleged conspiracy to fix the price of economy bread) was sold for a retail price of 17¢ (P–20, Exhibit A–1).

In July 1960, the Schulz Baking Company, which produced and sold Twentieth Century bread through a subsidiary, was under contract to produce for Frankford-Quaker Grocery Company Unity bread at a price per loaf (see P–11) which prevented it from making a profit, in view of increased material and labor costs which were affecting all the bakeries in the spring and summer of 1960 (N.T. 227). The Schulz Baking Company could not secure the consent of Frankford-Quaker Grocery Company to the increase of this price unless two factual situations prevailed, as follows:

1. There were increased costs of labor and increased costs in materials.

2. Three of the four major grocery chains in Philadelphia had increased their price of bread (N.T. 311).

Although the Schulz Company was in a position to demonstrate point #1 during the spring of 1960, it was not until early July that it could show that three of the above-mentioned four grocery chains had increased their price of bread. By mid-July, A & P, Acme and Penn Fruit had all gone up in the price of bread to two loaves for 37¢ (N.T. 311–4). Food Fair was selling its bread at the retail price of two for 35¢ (N.T. 313) and increased that price to two for 37¢ on July 19, 1960 (N.T. 316). Although the two prerequisites to the securing by the Schulz Baking Company of an increased price from Frankford-Quaker Grocery Company had been shown by July 15, 1960, the Schulz Company still had to secure the consent of the Frankford-Quaker Company to the increase in price and, in order to secure this consent, it represented to the Frankford-Quaker Company that "the independents were going up in price" (N.T. 317). By the "independents," they included Ward Baking Company. On July 15, 1960, Schulz had secured the agreement of at least one manufacturer (Rossi) of bread which sold its product to an independent distributor that this manufacturer would increase its price as of approximately the end of July to the independent distributor, so that the independent distributor would be required to raise its retail price to 17¢ per loaf. On or sometime after July 15, 1960, the Schulz Company secured similar consent of another manufacturer (Fleischmann) which supplied bread to the same independent distributor (New Century). The Schulz Com-

2. All notes of testimony references are to the transcript of the criminal trial (Criminal No. 21123) unless otherwise indicated.

pany approached other bakers, including defendant, during the period after July 15, 1960, in an effort to secure the increase in the price of economy bread in the Philadelphia market during July 1960 and thereafter. The evidence makes clear that the Schulz Baking Company was the dominant company in forming the conspiracy and in trying to secure other companies to join the conspiracy to raise the price of economy bread in the Philadelphia market, particularly because of its interest in securing a price rise for the bread which it was under contract to supply to the Frankford-Quaker Grocery Co. with the Unity label. The record makes clear that on or before July 18, 1960, the Schulz Baking Company ordered 17¢ end labels from its supplier so that these end labels would be available for other distributors, as well as itself, in the sale of economy bread at the 17¢ price (see P–18). On July 18, 1960, defendant increased its price of Dainty Maid bread to 17¢ per loaf retail. On or about August 1, 1960, the price of Twentieth Century bread was increased to 17¢ per loaf retail, but this retail price was decreased again to 15¢ per loaf within approximately 24 hours.

The only evidence, independent of declarations of alleged co-conspirators, connecting the defendant with the conspiracy is the following testimony of Charles L. Schulz, Jr. (secretary of Schulz Baking Company and manager of its Twentieth Century distributorship):

A. Sometime between April 1960 and June 1960, he was talking to a sales supervisor of the Ward Baking Company (Mr. Ryan) at the Philadelphia Navy Yard at the time of a bid opening. Mr. Ryan said "they were wondering when we could get the price of bread up in the City of Philadelphia" (N.T. 128). Mr. Ryan was referring to the 15¢ loaf (N.T. 130). Mr. Schulz said "we are also interested in getting a higher price for our bread" (N.T. 129).

B. A week or two after the above conversation at the Navy Yard, Mr. Ryan introduced Mr. Schulz to Mr. Doyle, the Philadelphia manager of the defendant, during a phone conversation. Mr. Doyle said "that Ward Baking Company was interested in raising the price of bread," he was wondering how Schulz felt about it, and Ward had a definite date in mind when they wanted to go up in price.[3] Mr. Doyle told Mr. Schulz the date on which Ward would raise the price and that date was within a month of the time of the phone conversation. Ward raised the price of its economy bread on the date Doyle said it would be raised (N.T. 155).

C. Within a week of this first phone conversation, there was a second phone conversation between Doyle and Schulz during which New Century bread was discussed and Schulz told Doyle "we felt they all wanted a price rise" (N.T. 140). Rossi and Fleischmann, the manufacturers of bread for New Century, were mentioned in this conversation. Mr. Schulz testified that (N.T. 143): "He (Doyle) wanted to know what we could do with our other competitors, as far as getting the price of bread up in that market." Mr. Schulz told Doyle "I would see what we could do about it" (N.T. 144).

The balance of the testimony of Mr. Schulz concerned phone conversations he had had with either Mr. Ryan or Mr. Doyle.[4] Since Mr. Ryan was clearly not an employee with sufficient authority to

3. The exact testimony appears at N. T. 135–6 as follows:
"Q And what did Oscar Doyle say to you about the bread business?
"A That Ward Baking Company was interested in raising the price of bread.
"Q Anything else?

"A He was wondering how we felt about it, and they had a definite date in mind when they wanted to go up in price."

4. Mr. Schulz was not able to testify which of these phone conversations he had had with Mr. Ryan and which he had had with Mr. Doyle.

make defendant liable for any conspiracy he aided, abetted or joined,[5] even if Mr. Schulz's testimony is accepted, it is not necessary to recite the testimony concerning these conversations.

Mr. Doyle denied the conversations were as described under B and C above (pp. 36–37 of Document 47), but testified that he received a phone call from Mr. Schulz in December 1960 during which Mr. Schulz said "they were going up in price the following Monday and he wanted to know what we were going to do" (pp. 37–38 of Document 47). Doyle replied that he "would pass on the information to my boss, Mr. Pankenier" (p. 38 of Document 47).[6]

■ Plaintiff has not sustained its burden of proof (see Burch v. Reading Co., 240 F.2d 574 (3rd Cir. 1957), cert. den. 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed. 2d 914 (1957)) on this record in the light of the applicable legal principles for these reasons, among others:

■ I. The evidence is most consistent with (or, at the least, equally consistent with) a finding that defendant raised its price due to economic factors affecting its sale of Dainty Maid bread[7] and reduced its price in late August 1960 due to a decrease in the sale of Dainty Maid, as well as of Ward's main line item (Tip Top Bread), resulting from the unwillingness of several retailers to carry defendant's products unless defendant was offering an economy loaf at 15¢ retail which would compete with other such bread in the Philadelphia area.[8] No violation of the antitrust laws is involved in exchanging information

---

5. During the period from April 24, 1960, until the end of that year, Mr. Ryan was one of five sales supervisors in the Philadelphia office. As such, he had the supervision of nine salesmen, each of whom had a route in West Philadelphia. He had previously been an assistant manager, but the position of sales supervisor was a "much easier job." A considerable amount of his time was spent in replacing unavailable men by driving their routes. It was his job to increase the sales of the company's products on the routes under his supervision. He canvassed stores in an effort to persuade them to sell defendant's products and checked the sales and "stales" on each of his routes. Occasionally he would take sales display material and promotional material to various stores on his routes to assist the salesmen over whom he had supervision. He answered complaints which were phoned in when the manager was not available and another sales supervisor did not answer the phone.

Under these circumstances, it is clear that he had no authority to bind the corporation to any participation he may have had in the conspiracy. See authorities cited under II on pages 10 to 12, below.

6. Mr. Pankenier testified that he vaguely remembered Mr. Doyle calling him, sometime between January 1, 1960, and April 30, 1961, about a conversation with someone from Schulz and he told Mr. Doyle to refrain from talking to competitors (pp. 15 and 33 of Document 48). Mr. Sidders testified that Mr. Pankenier reported to him that Mr. Schulz had called Mr. Doyle in December 1960, saying he wanted to talk to him (p. 13 of Document 50), and he told Mr. Pankenier to tell Mr. Doyle to carry out previous instructions not to talk to "anyone."

7. Defendant's Dainty Maid Loaf had been selling at 17¢ retail in the Trenton area since June 1959 (P–5). Mr. Sidders testified that when he "took over in 1959," he found Ward was "losing money on the Dainty Maid loaf wherever (it was sold) in that area." He raised the retail price in Trenton to 17¢, left the Philadelphia area price at 15¢ retail, and then raised that price to 17¢ also (p. 4 of Document 50).

8. At pages 4–5 of Document 50, Mr. Sidders used this language:
"Later the results of that increase in Philadelphia were so disastrous I had to drop the price back. I lost my main line business along with this Dainty Maid."
Again, at page 10 of Document 50, he testified:
"* * * that decision was based on the fact that the grocers resented the price increase and threw us out of the store with our main line product and the loss of sales volume made it necessary to reduce the price back."
Mr. Pankenier testified that the retail price of Dainty Maid bread was decreased to 15¢ on August 29, 1960, due to "loss in volume" (p. 24 of Document 48). The record shows a decrease in volume of both the Dainty Maid and Tip Top loaf prior to 8/29/60 (P–24).

on prices which have already been independently fixed and are about to become effective. See Pevely Dairy Co. v. United States, 178 F.2d 363, 369 (8th Cir. 1949), cert. den. 339 U.S. 942, 70 S.Ct. 794, 94 L.Ed. 1358 (1950), cited with approval in Continental Baking Company v. United States, 281 F.2d 137, 145 (6th Cir. 1960). In the Pevely Dairy Co. case, supra, 178 F.2d at pages 369–370, the court used this language:

"There was evidence that prior to October 1, 1942, Mr. Wasser, an employee of the Pevely Dairy Company, and Mr. Gee, an officer of the St. Louis Dairy Company, both having to do with sales, exchanged information as to prices which had already been fixed and were about to become effective. These witnesses were called by the government. Neither of them had any power of authority to fix prices and the information given was not with reference to any purpose to fix prices in the future but with reference to prices which had already been fixed. * * * [T]hey did not communicate the knowledge of the changes determined upon by reason of any agreement between the dairy companies. This testimony, we think, forms no basis for a legitimate inference of the making of or participation in any sort of a conspiracy for the fixing of prices. * * * *"

Thus, the testimony under B above that Doyle told Schulz that defendant was going to raise the price of bread in the future on a day certain is not in itself a violation of the antitrust laws.

Looked at from the viewpoint most favorable to the plaintiff, the record permits an inference that defendant was a party to an agreement from certain testimony (particularly that of Mr. Schulz) and also contains direct testimony of the employees of defendant that neither it nor they were a party to any such agree-ment [see testimony of Mr. Doyle (Document 47), Mr. Pankenier (Document 48), and Mr. Sidders (Document 50)]. Under these circumstances, plaintiff has not sustained its burden of proof. In the Pevely case, supra, the court said at page 370:

"* * * Circumstantial evidence, even in a civil case, is not sufficient to establish a conclusion where the circumstances are merely consistent with such conclusion or where they give equal support to inconsistent conclusions."

Assuming that Mr. Schulz's testimony presents prima facie evidence of Ward's connection with the conspiracy, which the undersigned does not find, plaintiff has the burden of persuasion on this issue and all the hearsay statements enumerated at pages 10 ff. of plaintiff's brief do no more than show that Charles Schulz made statements consistent with the inferences plaintiff wishes to be drawn from his unsatisfactory testimony. After evaluating this testimony, together with the other evidence in the case, the trial judge finds that the evidence as a whole does not satisfy plaintiff's burden of persuasion. Comments on certain cases relied on by plaintiff in this regard are contained in Appendix A.

II. The plaintiff has not sustained its burden of showing that an agent of defendant who had authority to bind it participated in any way in the conspiracy initiated by representatives of the Schulz Baking Company or ratified such participation.

The uncontradicted evidence establishes that Mr. Doyle had no authority to fix the prices of defendant's products (pp. 15–16 of Document 47, pp. 12–13 & 22 of Document 48, and pp. 37 & 100 of Document 50) and, unlike the situation before the court in Continental Baking Company v. United States, supra, 281 F.2d at page 149,[9] the record makes clear

---

9. This opinion makes clear that corporate defendant was bound because the agents of the corporate defendant who had authority to fix prices "adopted and ratified the acts of the depot managers" in an attempt to persuade or coerce competitors

that Mr. Sidders (Document 50) and Mr. Pankenier (Document 48), who had authority to fix prices, had no knowledge of any conversations such as those described in the testimony of Mr. Schulz (see A–C at page 715 above) and, hence, could not have ratified them. In fact, they both testified to their general instructions to all managers to refrain from discussions with competitors. On this record, plaintiff has not shown that Mr. Doyle had the requisite authority to bind defendant by the statements testified to by Mr. Schulz. See § 34, comment (g), Restatement of Agency 2d, where this language is used:

> "g. Illegal acts. Authority to do illegal or tortious acts, whether or not criminal, is not readily inferred. Thus, the appointment of a person to act as manager does not thereby give him authority to make trade agreements so opposed to public policy that they will not be enforced, or to inaugurate illegal blacklists or boycotts, * * *."

See, also, Flintkote Company v. Lysfjord, 246 F.2d 368, 384, 386 (9th Cir. 1957), cert. den. 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957).

III. For the following reasons, the testimony of Mr. Charles Schulz that Mr. Doyle made statements such as Ward "was wondering how (Schulz) felt about raising the price of bread" is not accepted by the trial judge:

A. It was the Schulz Baking Company which had the motive to see the price of bread increased in the Philadelphia market so that it could secure a higher price for the Unity loaf which it was manufacturing for Frankford-Quaker Grocery Co. (see pages 714, 715 above), whereas the Dainty Maid loaf was a secondary item for defendant.

B. When Mr. Schulz testified in April 1963, he had not worked for the Schulz Baking Company for approximately two years and had moved from Pennsylvania to Florida. His testimony was hesitant at many places and he manifested difficulty in remembering the conversations, occurring approximately three years before the time of his testimony, about which he was questioned. Insofar as his testimony attempted to state the exact words that were used in these conversations, it was unsatisfactory and not persuasive. This evaluation of his testimony does not imply that he was being consciously inaccurate.

C. Charles Schulz had a reason for favoring the Government during the April 1963 trial, since his father and his father's company had entered pleas of nolo contendere and were awaiting sentence, concerning which it is the practice of this court to receive recommendation of the Government in antitrust cases.

■ IV. The testimony contained in this record does not constitute the "definite factual showing of illegality" by this defendant required in order to secure the injunctive relief sought by plaintiff. See United States v. Philadelphia National Bank, 201 F.Supp. 348, 369 (E.D.Pa.1962), reversed on other grounds, 374 U.S. 321, 324, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); Standard Oil Co. (Standard) v. United States, 283 U.S. 163, 179, 151 S.Ct. 421, 75 L.Ed. 926 (1931); Appalachian Coals, Inc. v. United States, 288 U.S. 344, 377, 53 S.Ct. 471, 77 L.Ed. 825 (1933); cf. United States v. National City Lines, 134 F.Supp. 350, 354–355 (N.D.Ill.1955).

The length of the Government's brief (34 pages) makes it impractical to re-

---

to sell at the price level of the defendant corporation. Similarly, in United States v. Armour & Co., 168 F.2d 342 (3rd Cir. 1948), relied on by plaintiff, the court pointed out that the existence of 17 illegal violations in three out of five branch houses in the Philadelphia area

was "a condition prevailing of which it was the employer's duty to be aware," whereas in this case the record shows at most three equivocal phone conversations of a manager of one small branch who had limited authority and a very general discussion by a sales supervisor.

fute, specifically, all of its contentions as to the evidence. It is noted that many admissions admissible against particular defendants in the criminal trial are not admissible as admissions of Ward Baking Company. Also, much of the testimony relied on by the Government is inadmissible as hearsay (see, for example, testimony referred to in the last paragraph of page 23 of its brief, Document 59). In arguing that Charles Schulz has no motive to give testimony favorable to the Government in April 1963, the Government overlooks the fact that his father and his father's company had entered nolo contendere pleas to the indictment in Criminal No. 21123 and were awaiting sentence, at which time the Government would recommend to the court its suggested penalty for the most active participants in a criminal conspiracy. At page 8 of the opinion of November 15, 1963 (Criminal No. 21123), it was stated that "the representatives of Schulz were the most active members of a conspiracy formed in July 1960 with representatives of the Leo Rossi Baking Company and Fleischmann's Vienna Model Bakery, as well as Schulz's subsidiary, Twentieth Century Distributors, Inc., to raise the retail price of economy bread in the Philadelphia-Trenton area from 15¢ to 17¢."

The Government's reliance on a comment of the trial judge in the criminal case (see, for example, page 9 of the Government's brief—Document 59) is misplaced for several reasons, including these:

(a) The statement at N.T. 1558 was that a juror could find for the Government at the end of the Government's case, whereas the trial judge, at this conclusion of all the evidence in the civil trial, has the duty of making his own evaluation of all the evidence.

(b) The record now before the court includes far more evidence (including the testimony of four more witnesses) than was in the record when the above statement was made.

The able briefs of counsel have been most helpful and have been filed as Documents 58 to 63.

## ORDER

And now, June 21, 1965, it is ordered that judgment is entered for Ward Baking Company, defendant, and against United States of America, plaintiff.

## APPENDIX A

Assuming it has made a prima facie showing of connection of Ward to the conspiracy by independent evidence, which this court does not find, the plaintiff claims that declarations [10] of other conspirators relating to Ward but made in its absence are admissible under the co-conspirator exception to the hearsay rule to corroborate such prima facie showing of connection. Ward takes the position that such statements are not admissible on the ground that where there is no conspiracy issue,[11] there is no independent need for the admission of such evidence. Ward contends that hearsay declarations implicating Ward made in the absence of Ward remain hearsay as against Ward insofar as the truth of the matters contained in the declarations is concerned, because Ward is unable to cross-examine the declarants as to the truth of the matters contained in the implicating statements. The research of the parties has not disclosed any case dealing directly with this issue as stated by the parties. However, the cases cited

---

10. Since the trial judge finds that the evidence introduced by the Government is not sufficient to sustain plaintiff's burden of persuasion that Ward is connected to the conspiracy (see pp. 716–718, supra), these statements would not be admissible even under the interpretation of the co-conspirator exception to the hearsay rule advanced by plaintiff. However, even though it is not necessary for the trial judge to rule on this point, the opposing arguments of the parties and the cases primarily emphasized by plaintiff during the trial will be discussed.

11. In this case it is conceded that there was a conspiracy between several of the defendants to raise the price of economy bread.

by plaintiff in support of its position do not justify the admission of, or granting of substantial weight to, the hearsay declarations relied on by plaintiff.

In the case of United States v. Carminati, 247 F.2d 640 (2nd Cir. 1957), cert. den. 355 U.S. 883, 78 S.Ct. 150, 2 L.Ed.2d 113 (1957), relied upon by the plaintiff, the independent evidence connecting Galgano to the conspiracy was his own extra-judicial admission. An admission of guilt, like a confession, must be corroborated. See Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L. Ed. 101 (1954), cited by the court in Carminati. The hearsay declaration made in Carminati, supra, by one conspirator to another, implicating Galgano, was admitted only for the purpose of satisfying the requirement of corroboration for Galgano's extra-judicial admission of guilt. The opinion does not state that under such circumstances a hearsay declaration is admissible for all purposes, as the plaintiff suggests.

In footnote 20, page 735, of Carbo v. United States, 314 F.2d 718 (9th Cir. 1963), cited by the plaintiff, the District Judge in his charge to the jury states the general rule that when any one of a group of conspirators makes a statement in furtherance of the purpose of the conspiracy, it is binding on all the conspirators, assuming it has been proved that the alleged co-conspirator to which the declaration refers was in fact a conspirator. The facts of the case are not helpful because once the defendant's participation had been independently shown, the hearsay declarations were properly admissible as evidence of the conspiracy, which issue does not exist in the present case since the existence of the conspiracy was established by the record in the criminal trial. Furthermore, defendant's participation in the conspiracy has not been shown in this case.

In United States v. Mesarosh, 223 F. 2d 449 (3rd Cir. 1955), the question was whether statements of several of the conspirators, advocating the violent overthrow of the government, could be attributed to all. The court affirmed the rule admitting declarations of co-conspirators in furtherance of the conspiracy against all and stated that the rule "applies equally to motive and intent as to other issues" (p. 453). Among "other issues," the plaintiff apparently seeks to include corroboration. However, here again, as in Carbo, the court was addressing itself to a situation in which it was necessary to prove the existence of a conspiracy and the quoted language is, therefore, inapplicable to the present case.

In Esco Corporation v. United States, 340 F.2d 1000 (9th Cir. 1965), three of the four original defendants pleaded nolo contendere to a charge of price fixing under the Sherman Act. Therefore, the Government had to prove as to Esco, the one remaining defendant, not only Esco's connection but the existence of the conspiracy itself. The court found there was sufficient independent evidence to establish Esco's participation. Esco also disputed the admission of a letter, unaddressed and unsigned, but presumably from one conspirator to another and incriminating Esco by implication. The court states specifically (pp. 1008–1009) that the letter was properly admitted, not to prove Esco's participation but to prove conspiracy generally, which language does not lend support to the plaintiff's position that hearsay declarations of co-conspirators are admissible to corroborate independent evidence of connection where connection with the conspiracy is the only issue.